**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 99-41151

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ROBERT ANDREW CANTU,

Defendant-Appellant.

---

Appeal from the United States District Court
For the Southern District of Texas

---

October 6, 2000

Before KING, Chief Judge, and REYNALDO G. GARZA and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

Robert Andrew Cantu was sentenced to twelve years imprisonment after pleading guilty to a charge of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841. He appeals the district court's order denying his motion to suppress evidence discovered pursuant to a search of his home. The sole issue before this court is whether the district court erred in denying Mr. Cantu's motion to suppress evidence obtained after the officers

1

failed to announce their presence and purpose when attempting forcible entry of Mr. Cantu's home.

BACKGROUND

On July 1, 1998, at approximately 1:00 a.m., a seven-person team of officers with the Calhoun County Sheriff's Office executed a warrant to search Defendant's mobile home in Port Lavaca, Texas. The officers obtained the warrant pursuant to information from a confidential source who indicated that defendant Robert Cantu was selling cocaine and that the drugs were located at the defendant's residence. The officers did not have any specific reason to believe that the occupants of the Cantu residence were armed or posed any other substantial physical threat.

Operating under a "breach and announce" policy, which governed all forced entry cases undertaken by the Calhoun County Sheriff's Office, the seven officers donned ski masks, approached Defendant's front door, and tried to pry it open without first announcing their presence. Why the officers donned ski masks defies the imagination. If the idea was to conceal their identity, apparently the fact that such concealment would be blown by announcing who they were did not penetrate their consciousness.

The initial attempt to enter the home proved unsuccessful because the walls of the mobile home were too flimsy to support the leverage needed to pry the door open. After the failed initial attempt, the officers announced, "Sheriff's Office, search warrant!" Two officers testified that they detected movement

2

within the mobile home, but were unable to point to anything else that would indicate that evidence was being destroyed. The officers continued to try to gain entry using the crowbar. At no time during this period did any of the occupants of the mobile home open the door. Both the Defendant and the Defendant's wife testified that they were asleep at the time of the raid, but awoke when they heard what sounded like a fight or someone trying to break into their home. Approximately forty-five seconds after they announced their presence, one of the officers broke the door's window and unlocked the door from the inside. Defendant moved to suppress the cocaine, LSD, and marijuana seized from the residence alleging that it was the result of an unreasonable search and seizure.

DISCUSSION

When the district court makes factual findings following a pretrial hearing on a motion to suppress, this court reviews such findings for clear error, assessing the evidence in the light most favorable to the party that prevailed in the district court. *See United States v. Jones*, 133 F.3d 358, 360 (5th Cir.), *cert. denied*, 523 U.S. 1144 (1998). Legal conclusions are reviewed de novo. *See United States v. Cardenas*, 9 F.3d 1139, 1146 (5th Cir. 1993). Therefore, the district court's determination that the search of Mr. Cantu's home was reasonable under the Fourth Amendment is reviewed de novo. *See United States v. Seals*, 987 F.2d 1102, 1106

(5th Cir. 1993).

The Fourth Amendment assures that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . .." U.S. CONST. amend. IV. The Fourth Amendment embodies the common law principle that police officers should knock and announce their presence before they enter a private home. *See Richards v. Wisconsin*, 520 U.S. 385, 387 (1997) (citing *Wilson v. Arkansas*, 514 U.S. 927 (1995)). However, the knock-and-announce rule is not required when law enforcement concerns outweigh personal privacy interests. *See Wilson*, 514 U.S. at 934. The Supreme Court has left "to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment." *Id*.

The question presented in this case is whether the knock-and-announce rule applies equally to forcible entry *attempts* as to the actual breaking open of a door or window to a house. The federal knock-and-announce rule is codified at 18 U.S.C. § 3109. Section 3109 provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109. Basing its decision on a literal reading of the federal statute, this court held in *United States v. Fike* that the

knock-and-announce rule does not apply unless law enforcement officers actually break open an outer or inner door or window of a house to gain entry. *See United States v. Fikes*, 82 F.3d 1315, 1324 (5th Cir. 1996) (citing *United States v. Grier*, 866 F.2d 908, 934-35 (7th Cir. 1989)). Under this rule, law enforcement officers are not required to announce their presence unless they subsequently break into a house or they find exigent circumstances that would make announcing their presence "dangerous or futile, or . . . would inhibit the effective investigation of the crime." *Richards*, 520 U.S. at 394.

While "§ 3109 codifies the exceptions to the common-law announcement requirement, . . . and the common law in turn informs the Fourth Amendment, [the Supreme Court's] decisions in *Wilson* and *Richards* serve as guideposts in construing the statute." *United States v. Ramirez*, 523 U.S. 65, 73 (1998). In *Richards*, the Court held that "the Fourth Amendment incorporates the common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before *attempting* forcible entry." *Richards*, 520 U.S. at 387 (citing *Wilson v. Arkansas*, 514 U.S. 927 (1995)) (emphasis added). In construing the scope and application of § 3109, the Court in *Richards* and *Wilson* considered the common-law rule requiring officers to announce their presence before attempting forcible entry to outweigh the suggestive language in § 3109, which implies that officers must

5

actually break into the home for the rule to apply. *See id*.

Our conclusion is bolstered by the underlying rationale for the common-law knock-and-announce rule. Generally, the rule serves several fundamental interests including "(1) protecting law enforcement officers and household occupants from potential violence; (2) preventing the unnecessary destruction of private property; and (3) protecting people from unnecessary intrusion into their private activities." *United States v. Sagaribay*, 982 F.2d 906, 909 (5th Cir. 1993). In *Wilson*, the Supreme Court explained that the rule "was justified in part by the belief that announcement generally would avoid 'the destruction or breaking of any house . . . by which great damage and inconvenience might ensue[.]'" 514 U.S. at 935-36 (quoting *Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 196 (K.B. 1603)). The rule is also intended to protect against intrusions occasioned by law enforcement officers' mistakes. *See Ker v. California*, 374 U.S. 23, 57 (1963) (noting that the knock-and-announce rule is also based on such practical considerations as the possibility that police may be misinformed as to the name or address of the suspect) (Brennan, J., dissenting).

By limiting the requirement that police should knock and announce their presence and intentions only in situations where they actually break into a house undermines the interests protected by the knock-and-announce rule. First, allowing the police to

6

attempt entry into a home before announcing their presence heightens the possibility that the occupants of a house will react violently against the unknown aggressor, particularly if they resemble highwaymen in ski masks. Second, permitting the police to attempt an unannounced forcible entry subverts the interest in protecting private property. Finally, attempting entry without warning precludes the officers' ability to recognize possible mistakes in identity or location of the suspect or the place to be searched.

Therefore, our previous analysis in *Fike* no longer serves as the basis for assessing attempted forcible entries under the knock-and-announce rule. Rather, the reasonableness test outlined by the Supreme Court in *Richards* applies with equal force to attempts at forcible entry as it does to the actual breaking and entering of a person's home. *See also United States v. Gable*, 401 F.2d 765, 766 (3rd Cir. 1968) (holding that insertion of a crowbar into the door of a suspects house by officers before they announced their presence constitutes an unreasonable search); *United States v. McCloud*, 127 F.3d 1284, 1289 n.2 (10th Cir. 1997) (concluding that the reference point for the reasonableness determination begins prior to the officers' initial attempt to gain entry); *Kornegay v. Cottingham*, 120 F.3d 392, 396 (3rd Cir. 1997) (maintaining that law enforcement officers are required to announce their presence before attempting forcible entry); *United States v. Markling*, 7 F.3d 1309,

7

1318 (7th Cir. 1993) (concluding that officers must announce their presence and wait for a brief period before attempting entry).

The requirement that law enforcement officers announce their presence is flexible and "should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests." *Wilson*, 514 U.S. at 934. Courts must determine whether an unannounced entry is reasonable under the particular circumstances of the case and in light of law enforcement's actions as a whole. *See id.*; *Jones*, 133 F.3d at 361. In *Richards*, the Court set out the parameters of the reasonableness test:

> In order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous and futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. This standard--as opposed to a probable-cause requirement--strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries.

*Richards*, 520 U.S. at 394. The Court rejected blanket rules allowing "no-knock" entries based on over-generalizations about today's drug culture or other "general categor[ies] of criminal behavior." *Id.* at 392. Instead, officers must at least articulate some reasonable suspicion that "knocking and announcing would be dangerous, futile, or destructive to the purposes of the investigation." *Ramirez*, 523 U.S. at 71; *United States v. Mendoza-*

8

*Burciaga*, 981 F.2d 192, 196 (5th Cir. 1992). *See also United States v. Rodriguez*, 663 F. Supp. 585, 588 (D.D.C. 1987) ("In every case in which the courts have invoked the exigent circumstances exception, the police have testified that they had some specific and immediately ascertainable reason for fearing the loss of the desired evidence").

In light of these principles, it is clear that the search of Mr. Cantu's residence was unreasonable under Fourth Amendment analysis. The officers approached Mr. Cantu's home in the middle of the night and immediately began prying open his door. The officers had no prior knowledge that Mr. Cantu or the occupants of his residence were armed or posed immediate danger. When the officers approached the mobile home, Mr. Cantu, his wife, and two children were asleep inside. The only movement in the home that could rise to the level of any suspicion that evidence was being destroyed occurred after the officers' first attempt to gain entry.[1] Furthermore, the fact that the officers wore ski masks to execute the warrant reinforces the fact that the officers wanted to

---

[1] We note that exigent circumstances created by the police will not justify an unannounced entry into a home. The movement inside Mr. Cantu's home could reasonably be attributed to the initial attempt to physically pry open the door to his mobile home. Such "manufactured exigent circumstances" do not form an adequate basis for dispensing with the announcement requirement, especially when the initial attempt itself is unreasonable. *See United States v. Rico*, 51 F.3d 495, 502 (5th Cir. 1995); *United States v. Richard*, 994 F.2d 244, 248 (5th Cir. 1993); *United States v. Hultgren*, 713 F.2d 79, 88 (5th Cir. 1983).

conceal their identity.  Such law enforcement practices are clearly unacceptable.  Therefore, without any articulation of reasonable suspicion that announcing their presence would be dangerous, futile, or would result in destruction of evidence, the officers' initial attempt to forcibly enter Mr. Cantu's home was unreasonable.  Accordingly, we reverse the district court's order denying his motion to suppress and remand for further proceedings consistent with this opinion.

REVERSE AND REMAND.

KING, Chief Judge, specially concurring:


    I concur in the judgment reversing the district court's order denying Cantu's motion to suppress.  Unlike the majority, however, I do not see the issue as whether the knock and announce rule applies equally to forcible entry attempts as to the actual breaking open of the door or window.  Instead, I accept what all parties concede -- that the Fourth Amendment was violated when the raid party attempted to force its way into Cantu's home without first announcing its presence.  The question that we have to answer is whether events during the forty-five second delay between this violation and the subsequent entry means that the evidence seized was arrived at by means sufficiently distinguishable from the initial illegality to be purged of its primary taint.  Because the lawless conduct of the police officers was not too attenuated from the discovery of evidence, I agree that the evidence must be suppressed.


## I. Factual Background

    As an initial matter, this court must review the problematic execution of the Calhoun County Sheriff's Office raid on the Cantu residence.  On June 30, 1999, law enforcement officers secured a valid search warrant for Cantu's mobile home.  This

warrant was based on information obtained from an informant who alleged that Cantu sold cocaine out of his home.  The officers had no information that Cantu was armed, dangerous or likely to destroy evidence.  Pursuant to the search warrant, a team of more than seven law enforcement officers went to Cantu's mobile home to execute this warrant.

Testimony at the suppression hearing revealed that these officers, dressed in battle dress uniform, including combat helmets, goggles, bullet-proof vests and ski masks, surrounded Cantu's home at 1:00 a.m.  Following their standard procedure in executing narcotics search warrants,[2] they attempted to open the outward-swinging door of Cantu's mobile home using a large pry bar called a "haligan tool."  Officer Daigle admitted that he forcefully stuck the steel bar into the doorframe, attempting to pry the door away from the molding.  At this time, there had been no announcement of the officers' purpose, presence, or authority.  Daigle further testified that the entire mobile home was shaking as a result of his efforts to wrest open the door.

Only after this initial breach did the officers announce their presence and purpose.  The officers identified that they were from the Sheriff's Office and that they were at the residence pursuant to a search warrant.  Despite Daigle's ongoing

---

[2]The record of the suppression hearing revealed that the Calhoun County Sheriff's Office executed the same raiding procedure for all narcotics search warrants.

12

attempts, the door to the mobile home remained closed.

Like the panel majority, I accept the district court's finding that approximately forty-five seconds elapsed between the initial breach of the doorframe and the officers' eventual entry. From the officers' testimony, it appears Daigle continuously worked the pry bar in an effort to remove the door.[3] During this time officers were shouting that they were law enforcement officers with a search warrant.[4] As a result of the commotion, Robert Cantu's father, Ray Cantu emerged from the adjoining house to ask the officers what was happening. The officers ordered him back inside his home. The officers also testified that sometime after the initial blow to the doorframe they heard a movement in the bedroom area of the mobile home. They testified that, following this movement, they heard footsteps moving at a fast pace past their position at the door. Unable to open the door using the haligan tool, Daigle knocked out a window in the door and reached in to unlock the door. Once the door was unlocked, the officers entered the mobile home, secured Cantu, his wife, and two young children at gunpoint and read him his <u>Miranda</u>

_____

[3]At the suppression hearing, Daigle testified that he hit the door three times with the haligan tool, "working the door" back and forth in an attempt to pry it open. Officer Musgrave testified that Daigle hit the door with the haligan tool at least four times. Officer Amador testified that he saw Daigle hit the door four to five times.

[4]The testimony was that the officers shouted "Sheriff's Department. Search Warrant" five to ten times.

rights.   Cantu readily told the officers the location of the drugs, and he was arrested.

**II. The Officers' Actions Violated the Fourth Amendment**

The Fourth Amendment requirement that law enforcement officers executing a search warrant knock, identify themselves, and announce their purpose was violated the instant Officer Daigle breached the doorframe without first announcing his authority or presence.[5]  See Wilson v. Arkansas, 514 U.S. 927, 931 (1995).  As there were no exigent circumstances, and the law enforcement officers were acting under what the government admits was an unconstitutional policy of always breaching private homes before announcing their presence when executing narcotics search warrants, the actions of the officers were unreasonable under our Fourth Amendment analysis.  See id. at 930 ("[W]e hold that th[e] common-law 'knock and announce' principle forms a part of the

---

[5]In this respect, I agree with the panel majority that the district court erred in holding that "an attempt at entry is never constitutionally significant."  The Supreme Court has held: "[P]olice officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry."  Richards v. Wisconsin, 520 U.S. 385, 387 (1997) (emphasis added).  The district court relied on United States v. Fike, 82 F.3d 1315 (5th Cir. 1996), overruled in part on other grounds by United States v. Brown, 161 F.3d 256 (5th Cir. 1998). As the majority correctly points out, however, Fike interpreted 18 U.S.C. § 3109, which (at least as construed in Fike) requires an actual "break[ing] open any outer or inner door or window."  The "attempting" language in Richards mandates a different result in the instant case.

14

reasonableness inquiry under the Fourth Amendment."); <u>United States v. Jones</u>, 133 F.3d 358, 361 (5th Cir. 1998). Thus, the central freedom protected by the Fourth Amendment to be free from unreasonable searches and seizures was violated by the actions of the Calhoun County Sheriff's Office. <u>See</u> <u>Richards v. Wisconsin</u>, 520 U.S. 385, 387 (1997); <u>Wilson</u> 514 U.S. at 934 ("Given the longstanding common-law endorsement of the practice of announcement, we have little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search or seizure.").

The "no-knock" policy adopted by the Sheriff's Office runs counter to the holding of <u>Richards</u>, as it provides no particularized "reasonable suspicion that knocking and announcing. . . would be dangerous or futile, or that it would inhibit the effective investigation of the crime, by, for example, allowing the destruction of evidence." 520 U.S. at 394. The government and the lower court agree that such a categorical policy is unconstitutional and that the Sheriff's Office in this case lacked any particularized reasonable suspicion. Following <u>Richards</u>, I find such a "blanket exception" to the knock and announce requirement overbroad and that the execution of this policy violated Cantu's Fourth Amendment rights. <u>See id.</u> at 395.

15

**III. There Was Insufficient Attenuation Between the Constitutional Violation and the Entry by the Officers**

A. The District Court Erred in Analyzing "Cure"

The district court held that the evidence obtained after this failure to knock and announce was cured of its unconstitutional taint. The court provided two alternative justifications for this cure as the bases for its denial of the suppression motion. First, the court found that if the officers' "attempt" was not a constitutional violation, then the forty-five seconds that elapsed after the violation and before the entry rendered the subsequent discovery "reasonable" under the Fourth Amendment. Second, the court found that the "movement" heard in the mobile home during the raid provided an exigent circumstance that justified the officers' forcible entry. In contrast to the panel opinion, I find these "attenuation"[6] questions to be the dispositive issues before this court, but, on the facts presented, conclude that the district court erred in its determination.

As the panel is in agreement that there was a constitutional violation from the officers' attempt at entry, the predicate for the district court's reasonableness argument falls away. The

---

[6]See <u>Nardone v. United States</u>, 308 U.S. 338, 341 (1939) (recognizing that unconstitutionally obtained evidence can "become so attenuated as to dissipate the taint").

16

district court held that "if the attempt is never significant, the forty-five second period between announcement and actual entry is plainly reasonable under Jones."  See United States v. Jones, 133 F.3d 358, 361-62 (5th Cir. 1998) (holding that after properly knocking and announcing officers need only wait fifteen to twenty seconds before entering).  In other words, if there was no constitutional violation, the Jones holding should control.  As we are bound by Richards, which makes "attempts" constitutionally significant, this argument is inapposite.  See note 4, supra.

   The government, nevertheless, relies on Jones to argue that the fact that forty-five seconds elapsed is enough to cure the initial violation.  This argument, however, misapplies our holding in Jones.  The question before this court in Jones was whether after knocking and announcing their presence, officers who waited for a period of fifteen to twenty seconds acted reasonably under the Fourth Amendment reasonableness test.  See 133 F.3d at 361 ("The question of whether or not the officers in this case should have knocked and announced their presence and purpose is of no consequence, as it is conceded that they did just that.  Indeed, Jones admits that the officers knocked and announced their presence, but he argues that they did not wait a reasonable length of time before entering.").  Unlike the case before us, in Jones, there was no initial illegality and therefore no "attenuation" or "cure" question presented to the

17

court.  Our holding in Jones was that it was reasonable, under the facts presented, for the officers to enter fifteen to twenty seconds after knocking and announcing their presence.  We did not hold that an unconstitutional violation of the knock and announce rule could be cured in fifteen to twenty seconds.

As to the second justification for its holding, the district court relied on United States v. Fike, 82 F.3d 1315, 1324 (5th Cir. 1996), overruled in part on other grounds by United States v. Brown, 161 F.3d 256 (5th Cir. 1998), to find that subsequent events could cure an initial failure to knock and announce.  In Fike, law enforcement officers conducted a raid at the home of Eddie Franklin Douglas, one of twelve co-conspirators indicted in a drug conspiracy.  The officers broke down a gate outside Douglas's house, attempted to pull off the burglar bars on the front door and then attempted to force that door open.  Hearing the commotion, Douglas opened the kitchen door and was ordered at gunpoint to unlock the burglar bars on the door.  The question before this court was whether this action comported with the requirements of 18 U.S.C. § 3109.[7]  The court found that because

---

[7]Section 3109 reads in relevant part:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109.

18

the kitchen door had been opened before the officers actually broke open a door or window, under a strict reading of § 3109, there was no violation of the statute. See 18 U.S.C. § 3109 (requiring "break[ing] open any outer or inner door or window"). As this case was decided before Richards, the court never addressed the Fourth Amendment reasonableness issue.

I disagree with the district court that Fike teaches the lesson in the Fourth Amendment context "that whatever violation an attempt amounts to may be cured by a later occurring event." First, this conclusion is unsupported by the Fike holding, which never reached this issue of cure, never undertook a Fourth Amendment analysis and never considered attenuation.

Second, as stated in note 4 supra, the district court's use of Fike also ignores that Richards has interpreted the knock and announce rule to cover "attempt[s]." See Richards, 520 U.S. at 387 ("[P]olice officers . . . must knock on the door and announce their identity and purpose before attempting entry."). Therefore, the district court's use of Fike has no direct application to the Fourth Amendment reasonableness analysis necessary for Cantu's case.

Finally, Fike does not support the district court's exigency analysis because the Fike court specifically disclaimed reaching the issue of whether an exigency was created by Douglas's actions. See id. at 1324 ("[T]here was no violation of § 3109. For that reason, we need not reach the question of whether or not

19

exigent circumstances existed.").[8]

While Fike does not guide my analysis, I agree the question of attenuation raised by the district court is the dispositive question of the case.

### B. Attenuation Analysis

"Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the the evidence was a product of the constitutional violation." United States v. Miller, 146 F.3d 274, 279 (5th Cir. 1998) (citing Brown v. Illinois, 422 U.S. 590, 597-603 (1975)).[9]  A failure to knock and announce, leading to an

---

[8]The district court's reliance on another § 3109 case, United States v. Carter, 566 F.2d 1265, 1268-69 (5th Cir. 1978), is equally misplaced.  In Carter, the federal DEA agent announced his presence as a law enforcement officer and performed a no-knock entry only when individuals outside and inside the premise ran away from him.  In the instant case, entry and thus the violation occurred before any announcement of authority.

[9]As the Supreme Court in Wong Sun v. United States explained:

We need not hold that all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police.  Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

unconstitutional arrest and search, may, if not too attenuated, require suppression of evidence. See Sabbath v. United States, 391 U.S. 585, 586 (1968) (holding under § 3901 that because officers entered without knocking and announcing, the subsequent arrest was invalid and the evidence seized inadmissible).

In resolving attenuation questions, this court has adopted the multi-factor test set out in Brown v. Illinois to determine whether the fruit of an unconstitutional violation should be suppressed. 422 U.S. 590, 603-04 (1975). In Brown, the Supreme Court held that Miranda warnings did not cleanse the taint of a confession made pursuant to an unconstitutional arrest. See id., at 604-05.

Three factors have been distilled from Brown to evaluate the connection between the constitutional violation and the subsequent acquisition of evidence: (1) the temporal proximity of the illegal conduct and the discovery of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. See id. at 603-04; United States v. Vega, 221 F.3d 789, 801-02 (5th Cir. 2000) (applying the test to find that consent did not purge the taint of an unlawful search); United States v. Chavez-Villarreal, 3 F.3d 124, 128 (5th Cir. 1993) (applying the test to find coerced consent did not purge the taint of an unlawful stop); United States v.

_____

371 U.S. 471, 487-88 (1963) (internal quotations omitted).

21

<u>Miller</u>, 608 F.2d 1089, 1102-03 (5th Cir. 1979) (applying the test to physical evidence).

Using the <u>Brown</u> factors, this court must analyze the two "curative" events -- the elapsing of forty-five seconds and the "movement" -- to determine if the failure to knock and announce demands the suppression of evidence.

### 1. Temporal Proximity

Analyzing the first factor of "temporal proximity," I find that the forty-five seconds between the violation and the subsequent entry was not sufficiently attenuated to cure the unlawful action. Such a brief period of time standing alone is almost enough to vitiate any attenuation claim.[10] <u>See</u> <u>United</u>

---

[10]As I noted in dissent in <u>United States v. Sheppard</u>,

> The attenuation exception, however, requires greater temporal distance than seconds or minutes. Supreme Court decisions since <u>Wong Sun</u> have generally found that <u>hours</u> must elapse before evidence is purged of its taint. <u>Brown</u>, 422 U.S. at 604 (statement separated from illegal arrest by less than two hours not attenuated); <u>Dunaway [v. New York]</u>, 442 U.S. at 203, 218 (incriminating statements made within an hour of illegal arrest not sufficiently attenuated); <u>Taylor v. Alabama</u>, 457 U.S. 687 (1982) (confession six hours after illegal arrest not purged of taint of illegal arrest).

901 F.2d 1230, 1239 (5th Cir. 1990) (King, J., dissenting) (emphasis in original).

22

States v. Miller, 146 F.3d 274, 280 (5th Cir. 1998) (finding that ninety second time period between illegal stop and search does not support government's attenuation argument); Chavez-Villarreal, 3 F.3d at 128 (finding that fifteen minute wait at border between stop and search not enough to dissipate taint); United States v. Tookes, 633 F.2d 712, 716 (5th Cir. Unit B 1980) (finding passage of "few minutes" after illegal arrest and discovery of firearm not enough to dissipate taint).

Further and more important, the forty-five second measure does not take into account that the assault on the door was continuous. Even, assuming arguendo, that an initial violation of the knock and announce requirement could be cured by forty-five seconds of peaceful police activity (i.e., lawfully announcing their authority and presence), the objectives of the knock and announce requirement are not served in the case of a continuous assault. See United States v. Sagaribay, 982 F.2d 906, 909 (5th Cir. 1993) (finding the knock and announce rule to serve several Fourth Amendment interests including (1) protection of law enforcement officers and household occupants from potential violence, (2) prevention of unnecessary destruction of private property, and (3) protection for people from unnecessary intrusion into their private activities). It is difficult, then, to accept the government's argument that time, alone, removed the taint of the constitutional violation in this situation.

## 2. Intervening Circumstances

23

The second factor under Brown is whether there were any "intervening circumstances" sufficient to break the causal chain thus dissipating the taint of the initial illegality. The district court relied on testimony that after the officers attempted to enter the mobile home, "movement" was heard inside the house. This movement, the court concluded, created an exigency that then justified the officers' entry.

"Exigent circumstances 'include those in which officers fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence.'" United States v. Rico, 51 F.3d 495, 501 (5th Cir. 1995). The burden is on the government to prove the existence of the exigency. See id. The government argues that the movements heard after they began the raid caused them to believe evidence was being destroyed. This argument fails on two fronts.

First, the exigency on which the government relies was almost certainly created by the unconstitutional act of forcibly striking Cantu's door without knocking and announcing. See United States v. Rodea, 102 F.3d 1401, 1408 (5th Cir. 1997) ("[T]he exigent circumstances exception does not apply if the Government created or 'manufactured' the exigency"); Rico, 51 F.3d at 502 ("Just as exigent circumstances are an exception to the warrant requirement, a police-manufactured exigency is an exception to an exception."); United States v. Richards, 994 F.2d 244, 247 (5th Cir. 1993) ("Exigent circumstances, however, do not

24

pass Fourth Amendment muster if the officers deliberately create them."). The officers testified that the movement occurred only after Daigle used the haligan tool on the door.[11] The government, therefore, cannot meet its burden of demonstrating an exigency not of its own creation.

"In determining whether the exigent circumstances were manufactured by the agents, we . . . must consider not only the motivation of the police in creating the exigency but also the reasonableness and propriety of the investigative tactics that generated the exigency." Rodea, 102 F.3d at 1409. As presented in the suppression hearing, the "investigative tactics" employed in all narcotics raids in Calhoun County violated the requirement of knocking and announcing before entering. The resulting movement by Cantu or his family as a consequence of this unlawful action cannot, now, be said to create an exigency that cures the violation.[12]

The district court analyzed the "movement" under an exigency test as opposed to the intervening circumstance test as required by Brown. My review of the record, however, shows little support

---

[11]This movement, it must be remembered, was Cantu and his family being awakened at 1:00 a.m. by an unannounced police raid.

[12]This is not to in any way judge the "motivation" of the individual police officers in the raiding party. See Rico, 51 F.3d at 502 ("Exigencies can be manufactured guilelessly or ulteriorly. Although [t]here is no question that the deliberate creation of urgent circumstances is unacceptable[,] . . . bad faith is not required to run afoul [of the Fourth Amendment]." (citations omitted) (alterations in original)).

to find an intervening circumstance significant enough to dissipate the taint of the entry.

In <u>Brown</u> the court found no "significant" intervening circumstance from the defendant's initial illegal arrest and his eventual confession. 422 U.S. at 604.[13] The lack of an intervening circumstance is even stronger in a case like Cantu's in which the evidence found is physical evidence as opposed to a confession.[14] <u>See, e.g.,</u> <u>Miller</u>, 146 F.3d at 280 (finding no

---

[13]Explicating its earlier attenuation holding in <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963), the <u>Brown</u> Court contrasted two types of "intervening circumstances" that arose in that case. In <u>Wong Sun</u>, the initial arrest without probable cause of James Wah Toy led to the questioning and eventual discovery of narcotics in Johnny Yee's home. This discovery, in turn, led to the arrest of Wong Sun. After arraignment Wong Sun was released, but later voluntarily returned to give an incriminating statement to police. The Supreme Court held that this act of returning was an intervening circumstance, thus dissipating the taint of the original illegal arrest. <u>However, the court also held that the discovery of physical evidence (narcotics) as a direct result of Toy's initial illegal arrest was not attenuated, and "did not result from an intervening independent act of free will," and thus "was not sufficiently an act of free will to purge the primary taint of the unlawful invasion</u>." <u>Brown</u>, 422 U.S. at 598 (emphasis added) (quoting <u>Wong Sun</u>, 371 U.S. at 486).

[14]Courts have held that lengthy time lapses cannot remove the taint on physical evidence. <u>See United States v. Ienco</u>, 182 F.3d 517, 528 (7th Cir. 1999). Again, compare for example, in <u>United States v. Ceccolini</u>, 435 U.S. 268, 275 (1978), the court held that testimony of a witness discovered as a result of an illegal search was admissible, despite a lengthy time lapse because the taint was cleansed by an intervening act of free will. Importantly, the court distinguished live testimony from the physical type of evidence present in Cantu's case:

   [T]he exclusionary rule should be invoked with greater reluctance where the claim is based on a causal relationship between a constitutional violation and the discovery of a live witness <u>than when a similar claim is advanced to support</u>

26

intervening circumstances where initial stop led directly to search and discovery of drugs in motor home); <u>Tookes</u>, 633 F.2d at 716 (finding no intervening circumstance in defendant being placed in back seat of police car and driven around the block before pistol was discovered); <u>see also</u> <u>United States v. Ienco</u>, 182 F.3d 517, 528 (7th Cir. 1999) (formal arrest not an intervening circumstance sufficient to attenuate discovery of incriminating evidence); <u>United States v. King</u>, 990 F.2d 1552, 1564 (10th Cir. 1993) (abandonment of drugs not an intervening circumstance).

Under a <u>Brown</u> analysis the "movement" cannot be considered an intervening circumstance, because the officers had been trying to enter all along.  This was a single continuous assault. Because the constitutional violation occurred before the movement, and the officers intended to enter with or without movement, far from being an "intervening circumstance," the movement seems irrelevant to the officers' actions.  I, therefore, cannot accept that the "movement" in any way created an exigency that cured or interrupted the execution of this policy.

### 3. Purpose and Flagrancy of Official Misconduct

The final <u>Brown</u> factor for analysis is the purpose and

<u>suppression of an inanimate object</u>.
<u>Id.</u> at 275 (emphasis added).

flagrancy of the official misconduct. Here, the officers executed an admittedly unconstitutional policy that ignored the knock and announce requirements in contravention of the Fourth Amendment. The officers testified to having performed this breach then announce policy between fifteen to twenty other times. In each case they presumably failed to knock and announce their presence before entering the home. This practice meets the "quality of purposefulness" required by the Court in Brown. See 422 U.S. 590, 605 (1975); see also Miller, 146 F.3d at 280 (finding flagrant or purposeful action in stopping a suspect without probable cause); United States v. Causey, 818 F.2d 354, 361 (5th Cir. 1987) (finding illegal arrest "amounted to a flagrantly abusive violation of Fourth Amendment rights.").

"In the fourth amendment context, the 'single and distinct' purpose for the exclusionary rule is deterrence of police violations of th[e] constitutional protection against unreasonable searches and seizures." United States v. Brookins, 614 F.2d 1037, 1046-47 (5th Cir. 1980); see also United States v. Sheppard, 901 F.2d 1230, 1239 (5th Cir. 1990) (King, J., dissenting) ("[T]he exclusionary rule's primary function is deterrence."). In this case, where the failure to knock and announce was pursuant to a flagrant policy of disregarding the Fourth Amendment, I am compelled to agree with the panel majority that the district court's order denying Cantu's motion to suppress should be reversed.